(No. 48065.—▮▮▮▮▮▮

JOHN P. TOUHY, Chairman, Illinois Democratic Central Committee, Plaintiff, v. THE STATE BOARD OF ELECTIONS, Defendant.

*Announced December 8, 1975.—Opinion filed January 26, 1976.*

GOLDENHERSH, J., took no part.

WARD, C.J., and KLUCZYNSKI, J., dissenting.

Raymond F. Simon, of Chicago, for plaintiff.

William J. Scott, Attorney General, of Springfield (Fred F. Herzog, of Chicago, of counsel), for defendant.

Sidley & Austin, of Chicago (Jack Guthman, of counsel), for *amicus curiae* the Democratic National Committee.

William H. Luking, of Chicago, for *amicus curiae* the Committee on Illinois Government.

Jenner & Block, of Chicago (Chester T. Kamin, of counsel), for *amicus curiae* Governor Daniel Walker.

PER CURIAM: On December 1, 1975, the plaintiff, John P. Touhy, chairman of the Illinois Democratic Central Committee, applied for leave to file an original petition for *mandamus* against the defendant, the Board of Elections of the State of Illinois. Leave to file was granted, issue was joined upon the complaint and a motion to dismiss filed on behalf of the defendant, and briefs were filed on an extremely accelerated schedule. Applications for leave to intervene were filed on behalf of Daniel Walker, Governor of Illinois, who sought leave to intervene as an individual citizen and as a member of the Democratic Party, and also on behalf of the Committee on Illinois Government, a not-for-profit corporation, and John S. Matijevich and Sarah Beatty, citizens and voters. Both applications for leave to intervene were denied, but both applicants were granted leave to file *amicus curiae* briefs. Leave was also granted to the Democratic National Committee to file an *amicus curiae* brief.

The petition for *mandamus* relates to the method to be used in apportioning the delegates to the Democratic National Convention among the congressional districts within the State of Illinois. The pertinent statute (Ill. Rev. Stat. 1973, ch. 46, par. 7—14.1) provides two alternative formulae to be used in selecting delegates and alternate delegates to national political party conventions. One of these formulas, "Alternative A," has been used by the Republican Party; the other, "Alternative B," has been used by the Democratic Party. Alternative A is not involved in this case. Alternative B provides:

"The State Board of Elections shall allocate the number of delegates and alternate delegates to which the State is entitled, as the case may be, among the congressional districts in the State for election from the congressional districts. The Board shall utilize the following formula to determine the number of delegates or alternate delegates, as the case may be, to be elected from each congressional district: The number to be elected from a district equals the product of (a) the sum of the fraction calculated by

dividing the population of the district according to the last decennial Federal census by the total population of the State according to that census, plus the fraction calculated by dividing the number of votes cast in the district for that party's candidate for President in the preceding Presidential election by the total number of votes cast in the State for the party's candidate for President in the preceding Presidential election; (b) one half; and (c) the number of delegates, or alternate delegates as the case may be, to which the State is entitled at that party's national convention. The foregoing formula may be represented, in summary form as follows: the number to be elected from a district equals

$$\frac{\text{Dist. Population}}{\text{State Population}} + \frac{\text{Vote in Dist. for party Presidential Candidate}}{\text{Vote in State for party Presidential Candidate}}$$

X [ ½ ] X [Number of delegates to which State is entitled.] The whole number of delegates so determined, disregarding fractions, shall be allocated to the respective congressional districts in the State. The remainder of the delegates shall be elected at large in the primary or chosen by the State convention of the appropriate party as determined by the State central committee of the party at the same time it makes the certification as to which of the alternatives under this section it wishes to be utilized in allocating its delegates."

The complaint alleged that on March 1, 1975, the Democratic National Committee adopted delegate selection rules for the 1976 Democratic National Convention. These rules set forth four different acceptable formulas for apportioning delegates to the Democratic National Convention within a State. These four formulas are:

"(1) a formula giving equal weight to total population and to the average of the vote for the Democratic candidates in the two most recent presidential elections;

(2) a formula giving equal weight to the vote for the Democratic candidates in the most recent presidential and gubernatorial elections;

(3) a formula giving equal weight to the average of the vote for the Democratic candidates in the two most

recent presidential elections and to Democratic Party registration or enrollment as of January 1, 1976;
(4) a formula giving one-third (1/3) weight to each of the formulas in items (1), (2) and (3)."

The complaint further alleged that a proposed delegate selection plan was submitted by the plaintiff to the National Democratic Committee and on August 8, 1975, that plan was approved by the Compliance Review Commission of the Democratic National Committee. This formula provides:

"Equal weight shall be given to the average of the vote for the Democratic candidates in the two most recent presidential elections and to Democratic Party enrollment as measured by the Democratic Party vote in the primary election of March 19, 1974.

Fractions shall be placed in rank order, highest first, and delegates shall be allocated thereby until the full complement is reached."

The rules of the National Committee provide: "Whenever any part of any section contained in these rules conflicts with existing State laws, the State Party shall take provable positive steps to achieve legislative changes to bring the State law into compliance with the provisions of these rules." The complaint alleges that House Bill 3052, which provided for adoption of formula No. 3 of the Democratic National Committee rules, was introduced in the General Assembly. The General Assembly failed to pass the bill, however, and on November 21, 1975, adjourned until January 14, 1976.

The complaint described the statutory time schedule that governs the steps to be taken in connection with the publication and certification of delegate selection plans to the county clerk of each county. It alleged that the Democratic State Central Committee is required by statute to certify to the State Board of Elections, on December 8, 1975, which of the two alternative plans provided in the existing statute it wishes to utilize, and that: "the

Democratic State Central Committee of Illinois cannot, of course, select either of the plans set out in Section 7—14.1 because neither conforms with the rules of the Democratic National Committee."

The complaint stated: "In order to elect delegates and alternates in the March 16, 1976 primary, this court should act on or before December 8, 1975."

The complaint also stated: "This case presents an issue involving State law which must be determined promptly and finally by this court." And finally, the complaint asserted that there is no question of fact in the case; that the only question presented is the legal question of whether the decision of the Supreme Court of the United States in *Cousins v. Wigoda,* 419 U.S. 477, 42 L. Ed. 2d 595, 95 S. Ct. 541 (1975), commands that the rules of a national political party must be accorded primacy over nonconforming State law.

The case was orally argued on December 5, 1975. Upon the argument it appeared that the plaintiff had not requested the defendant to take the action sought to be compelled, and the Attorney General was directed to submit plaintiff's plan to the Board of Elections to determine whether defendant would certify the plan. The Attorney General reported that because the plan was not in accordance with either statutory alternative, it was the position of the Board that "[t] here is no authority for this Board as an administrative agency to set aside a legislative enactment without an order of Court."

After considering the briefs and the arguments of the parties, the court entered an order on December 8, 1975, which denied the petition for *mandamus.* This opinion explains the reasons for that action.

From a legal point of view, the plaintiff's case rests upon the decision of the Supreme Court of the United States in *Cousins v. Wigoda,* 419 U.S. 477, 42 L. Ed. 2d 595, 95 S. Ct. 541 (1975). That case involved the seating of delegates to the 1972 National Democratic Convention.

The "Wigoda delegates" had been elected in accordance with the law of Illinois. The rival group, the "Cousins delegates," challenged the seating of the Wigoda delegates before the Credentials Committee of the National Democratic Party on the ground that the slate-making procedures under which the Wigoda delegates had been initially nominated violated Party guidelines that had been incorporated in the call of the convention. The Credentials Committee sustained the report of a hearing officer which found that the slate-making procedure which resulted in the nomination of the Wigoda delegates violated the Party guidelines. The Committee recommended that the Wigoda delegates be unseated and that the Cousins delegates be seated in their stead. The case came before the Supreme Court of the United States upon a review of an injunction issued by the circuit court of Cook County, Illinois, affirmed by the appellate court, which had enjoined the Cousins delegates from acting or purporting to act as delegates to the Democratic National Convention. The determination of the appellate court was based upon the ground that the right to sit as a delegate representing Illinois at the national nominating convention is governed exclusively by the Illinois Election Code and that the law of the State is supreme and Party rules to the contrary are of no effect. The opinion of the Supreme Court stated: "We granted certiorari to decide the important question presented whether the Appellate Court was correct in according primacy to state law over the National Political Party's rules in the determination of the qualifications and eligibility of delegates to the Party's National Convention." (419 U.S. at 483, 42 L. Ed. 2d at 600, 95 S. Ct. at 545.) And the court emphasized that that question was the only one decided.

In our opinion the plaintiff attaches undue significance to the decision in *Cousins v. Wigoda*. For example, it is stated in the *amicus* brief of the Democratic National Committee: "Under the principles articulated by the

United States Supreme Court in *Cousins v. Wigoda* [citation], a national political party's rules with respect to the qualifications and eligibility of delegates must be given primacy over conflicting State rules. In the present case, this Court is asked to prevent the Board of Elections of the State of Illinois from implementing a delegate selection scheme inconsistent with the rules of the national political party and to direct that the Board instead implement a selection plan which has *already been specifically approved* by the party." The point is perhaps more bluntly made in the plaintiff's brief: "Plaintiff emphasizes that this Court is not determining a *substantive issue, i.e.,* it is not determining the propriety of a selection formula nor is it making a decision as between various election formulae. Rather, this Court is acting as a funnel, simply taking the decision of the Democratic National Committee and directing a ministerial body to implement that decision pursuant to the mandate of *Cousins*. *** The *Cousins* decision makes legislative action in the area of delegate selection inappropriate where it conflicts with National Party rules. Thus existing Chapter 46, Section 7–14.1 is an unconstitutional restriction of freedom of association and is inappropriate legislation in that it conflicts with the National Party Rules."

We do not read the opinion in *Cousins* so broadly. That opinion, like all others, must be read in the context of the specific problem that was before the court. That problem was the validity of an injunction that restrained the members of the Cousins group "from acting or purporting to act as a delegate to the Democratic National Convention *** [and] from performing the functions of delegates *** [and] from receiving or accepting any credentials, badges or other indicia of delegate status ***." 419 U.S. at 480, 42 L. Ed. 2d at 599, 95 S. Ct. at 544.

The plaintiff's reading of the *Cousins* case, as applied to the facts before us, would raise serious constitutional issues. We are reluctant to assume, for example, as the

plaintiff seems to assume, that the General Assembly could validly delegate to any and every national political party the authority to formulate such delegate apportionment plans as it saw fit, to be implemented at State expense. And we are by no means satisfied that the "funneling" function assigned to the court under the plaintiff's reading of the *Cousins* case is one which can properly be performed by an Illinois court.

But if we set aside these doubts, and assume that the function we are asked to perform is a proper one, there would remain a serious question as to the fundamental fairness, if not indeed the constitutional validity, of the plaintiff's proposal for the allocation of the delegates among the various congressional districts within the State. It is not disputed that the substitution of the present statutory Alternative B for formula No. 1 under the Democratic National Committee rules would result in the shifting of only one delegate from one congressional district to another. The plan upon which the plaintiff insists, however, would result in an increase of 19 delegates to be selected from the congressional districts within the city of Chicago and a corresponding decrease in the number of delegates to be selected from congressional districts elsewhere in the State. No justification for this substantial change has been submitted.

The complaint alleged that two proposals were put before the Illinois General Assembly and rejected by that body: proposal No. 3 of the National Committee, and the plaintiff's proposal. There is no suggestion in the complaint that the plaintiff and the State Central Committee sought the enactment of proposal No. 1 of the National Committee. Nor did the complaint allege that the reaction of the Compliance Review Commission to the present statutory Alternative B was sought. There is no reason to suppose that that alternative would be unacceptable, particularly since it would cause far less disruption than would the plaintiff's proposal, which does not itself

comply with any of the four formulas promulgated by the Party.

The substantial change in the allocation of delegates among congressional districts that would be brought about by the plaintiff's proposal is the result of the inclusion in that proposal of an ingredient that is not authorized by the Democratic National Party formulas or by the State statute. That ingredient is the Democratic vote at the 1974 Democratic primary. It is true that the delegate selection rules of the Democratic National Party include, as an ingredient in its formula No. 3, "Democratic party registration or enrollment as of January 1, 1976." Those rules, however, were adopted on March 1, 1975, and they were apparently designed to stimulate party enrollment in the future. But party registration or enrollment is not stimulated by the retroactive use of a past primary vote as a factor in determining the future allocation of delegates among congressional districts. Nor was such a factor an accurate indicator of the proportionate party strength of any congressional district even at the time the primary was held. The vote in such a primary is at least as likely to reflect the intensity of intra-party contests for local offices as it is to indicate relative party strength within any district.

In an original action for writ of *mandamus*, this court will consider only questions of law. (Ill. Rev. Stat. 1973, ch. 110A, par. 381(a).) Therefore, if factual questions are present, *mandamus* is inappropriate (*cf. People ex rel. Ward v. Moran*, 54 Ill.2d 552 (1973)), and this court will not assume jurisdiction. *People ex rel. Jones v. Robinson*, 409 Ill. 553 (1951); *Monroe v. Collins*, 393 Ill. 553 (1946).

While plaintiff alleges that only questions of law are present, in our view the record contains factual questions whose resolution is necessary to a determination of plaintiff's entitlement to relief. For example, the Touhy plan states in paragraph 19: "This plan is dependent upon the passage of legislation, presently pending in the Illinois

General Assembly, which is being supported by the State Central Committee through provable, positive steps." Such pending legislation was not enacted. In view of this situation, there would seem to be a fact question as to whether or not the Touhy plan remains viable.

For all of the reasons that have been stated, a majority of the court is satisfied that the plaintiff has not shown himself to be entitled to the writ of *mandamus,* and the petition for the writ is therefore denied.

*Writ denied.*

MR. JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.

MR. JUSTICE KLUCZYNSKI, dissenting:

The majority indicates that the plan which plaintiff seeks to have implemented is at variance with the four formulas sanctioned by the National Democratic Party. This view materially diminishes the facts that the plan presently at issue was approved by the Compliance Review Commission of the Democratic National Committee as well as the position of this committee in its *amicus* brief which urges the adoption of the relief sought by plaintiff.

The majority's reservation that a national political party will formulate delegate apportionment plans to be implemented at State expense implies the consideration that a national political party will devise a selection method imposing an undue financial burden upon the taxpayers of this State. I do not believe that a national political party would act in such an irresponsible manner, and the plan now sought to be implemented certainly does not entail a financial burden in excess of that created by section 7—14.1. Moreover, the General Assembly is not without recourse to prevent a potential abuse because it could amend section 7—6 of the Election Code relating to primary expenses to deal with such a situation.

Further, I do not agree with the majority's constitutional implication concerning the " 'funneling' function

# 314

assigned to the court." The terminology utilized by plaintiff is unfortunate but does not raise a constitutional impairment for relief.

The majority has severely restricted the impact of *Cousins v. Wigoda,* wherein the Supreme Court stated:

> *"But respondents overlook the significant fact that the suffrage was exercised at the primary election to elect delegates to a National Party Convention. Consideration of the special function of delegates to such a Convention militates persuasively against the conclusion that the asserted interest constitutes a compelling state interest. Delegates perform a task of supreme importance to every citizen of the Nation regardless of their State of residence. The vital business of the Convention is the nomination of the Party's candidates for the offices of President and Vice President of the United States. To that end, the state political parties are 'affiliated with a national party through acceptance of the national call to send state delegates to the national convention.' Ray v. Blair, 343 U.S. 214, 225 (1952). The States themselves have no constitutionally mandated role in the great task of the selection of Presidential and Vice-Presidential candidates. If the qualifications and eligibility of delegates to National Political Party Conventions were left to state law 'each of the 50 states could establish the qualifications of its delegates to the various party conventions without regard to party policy, an obviously intolerable result.' "* (Emphasis added.) (419 U.S. at 489-90, 42 L. Ed. 2d at 604-05, 95 S. Ct. at 548-49.)

I do not believe that the aforesaid language imparts a restrictive meaning upon the *Cousins* decision.

The majority seems to fault plaintiff for not seeking enactment of formula No. 1 by the legislature or adoption

of Alternative B by the National Committee. There are four formulas devised by the National Democratic Committee, and this court is not in a position to pass upon the merits of any one plan. In any regard this consideration does not appear to have relevant bearing on disposition of this case. And it should be further noted that Alternative B does not comport with the formulas or variation thereof authorized by the National Democratic Committee.

The majority closely scrutinizes the various statutory and party selection formulas, concluding that plaintiff's plan would result in an unjustified change in the number of delegates from several congressional districts. The majority deems the inclusion of the factor of the 1974 Democratic Party primary as crucially significant in rejection of plaintiff's plan. Apparently the majority has determined that inclusion of this factor in allocating delegates to each congressional district is not an accurate indicator of actual party strength. It should be noted that inclusion of the factor pertaining to the number of votes cast by voters for the Democratic presidential candidate in 1972 in allocating delegate strength in Alternative B may be said to create the same speculation. Barring definite establishment of some constitutional deprivation, which has not been done in this case, I do not find that inclusion of the results of the 1974 primary as a factor in delegate allocation is improper, nor do I believe it to be the function of this court to consider the wisdom or unwisdom of any particular plan.

Finally, the majority finds that factual matters are presented which might pose a question as to the continuing viability of the Touhy plan. To support this conclusion the majority observes that State legislation to implement the Touhy plan has not been enacted, and the majority quotes from paragraph 19 that "This plan is dependent upon passage of legislation *** ."

I would reemphasize that Alternative B is in conflict with the formula that is acceptable to the Democratic

National Committee. In the latter's *amicus* brief it is candidly said that "The delegate selection procedure required by existing Illinois state law conflicts with the approved Plan and with the Delegate Selection Rules adopted by the Democratic National Committee." In light of the decision of *Cousins v. Wigoda,* 419 U.S. 477, 42 L. Ed. 2d 595, 95 S. Ct. 541, the assertion of the Democratic National Committee as to the existence of such conflict must be given substantial import. See also *O'Brien v. Brown,* 409 U.S. 1, 34 L. Ed. 2d 1, 92 S. Ct. 2718.

I disagree with the majority in its interpretation of the failure to enact legislation to implement the Touhy plan. Such basis should not be the reason to procedurally defeat consideration of plaintiff's claim, especially in view of this court's observation that *mandamus* may be an appropriate remedy in situations where the traditional elements of this action have not been present. (See *People ex rel. Rice v. Cunningham,* 61 Ill.2d 353, 356.) Moreover, had legislation to which the majority refers been enacted, plaintiff would have had no reason to seek relief.

The broad assertion that a question of whether the "Touhy plan remains viable" is unclear. But if the majority opinion is to be read as suggesting that legislative action is preeminent for consideration of the merits of this case or is a condition precedent to actual implementation of the Touhy plan by the National Democratic Committee, such reliance is misplaced. The State does not possess a compelling interest in the selection of delegates to a national party convention and in determination of their eligibility or qualifications. (*Cousins v. Wigoda,* 419 U.S. 477, 42 L. Ed. 2d 595, 95 S. Ct. 541.) The language to which reference is made in paragraph 19 of the Touhy plan may be construed as merely a recognition of the existing conflict and the normal attempt to be made for orderly implementation of the formula approved by the Democratic National Committee without resort to extraordinary activity to implement the plan. Moreover, the present

posture of the Democratic National Committee can hardly be construed as an abandonment of the Touhy plan.

The majority has not advanced convincing reasons for rejection of plaintiff's claim, and for this reason I respectfully dissent.

MR. CHIEF JUSTICE WARD, also dissenting:

I would join in Mr. Justice Kluczynski's dissent.

I consider the majority's holding is offensive to that in *Cousins v. Wigoda,* where the Supreme Court held the appellate court of Illinois erred in according primacy to State law over a national political party's rules in determining the selection of delegates to the party's national convention. The majority in effect approves our statute which has a Republican formula and a Democratic formula to be used in selecting candidates to national political party conventions. This contradicts the holding of *Cousins v. Wigoda* that State law is not to be given primacy in the determination of this question. I would hold that the statute unconstitutionally abridges political associational rights of the plaintiff and associates and interferes with the national party's right to determine the composition of its national convention in accordance with standards set by the party, as opposed to State constructed formulae for use by political parties. *Cousins v. Wigoda.*