(Nos. 52339, 52366 cons.—

CONTINENTAL ILLINOIS NATIONAL BANK AND TRUST COMPANY OF CHICAGO *et al.*, Petitioners, v. JAMES B. ZAGEL, Director of Revenue, *et al.*, Respondents.—PAUL W. SWANSON *et al.*, d/b/a Chapel Hill Properties, Petitioners, v. JAMES B. ZAGEL, Director of Revenue, *et al.*, Respondents.

*Opinion filed November 21, 1979.*

CLARK and RYAN, JJ., concurring in part and dissenting in part.

MORAN, J., dissenting.

Wayne W. Whalen, Scott J. Davis and James K. Genden, of Mayer, Brown & Platt, of Chicago, for peti-

tioners Continental Illinois National Bank & Trust Co. and Central Illinois Light Co.

William I. Goldberg and Donald Page Moore, of Antonow & Fink, of Chicago, for petitioners Paul W. Swanson *et al.*

William J. Scott, Attorney General, of Springfield (Herbert L. Caplan, First Assistant Attorney General, and Jeremiah Marsh, Special Assistant Attorney General, of Chicago, of counsel), for respondents.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Deputy State's Attorney, of counsel), for *amicus curiae* County of Cook.

William R. Quinlan, Corporation Counsel, of Chicago (Robert Retke, Assistant Corporation Counsel, and Lee J. Schwartz, Special Assistant Corporation Counsel, of counsel), for *amicus curiae* City of Chicago.

Joseph A. Power and Michael J. Murray, of Chicago (William J. Harte, of counsel), for *amici curiae* Chicago Park District and Board of Education of the City of Chicago.

R. Garrett Phillips, of Springfield, for *amicus curiae* Illinois Association of School Boards.

Thomas D. Nyhan, Robert C. Bonges and James J. Brennan, of Chicago (Pope, Ballard, Shepard & Fowle, of counsel), for *amicus curiae* Illinois State Chamber of Commerce.

DeJong, Poltrock & Giampeitro, of Chicago (Lawrence A. Poltrock, Wayne B. Giampietro and Gregory N. Freerksen, of counsel), for *amicus curiae* Illinois Federation of Teachers, AFL-CIO.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

Two original taxpayers' actions (Ill. Const. 1970, art.

VI, sec. 4(a)) relating to revenue (see, *e.g., People ex rel. Klinger v. Howlett* (1972), 50 Ill. 2d 242; *People ex rel. Ogilvie v. Lewis* (1971), 49 Ill. 2d 476; *Thorpe v. Mahin* (1969), 43 Ill. 2d 36) were filed pursuant to leave of this court (58 Ill. 2d R. 381) and consolidated for argument and opinion. Both complaints seek a declaratory judgment that the Illinois replacement tax act (Pub. Act 81—1SS—1, effective August 14, 1979, hereinafter referred to as the Act) is invalid.

Cause No. 52339 was filed on the effective date of the Act by Continental Illinois National Bank and Trust Company of Chicago and Central Illinois Light Company. That petition seeks invalidation of the Act on several constitutional grounds, primarily attributable to article IX, section 5(c), of the Illinois Constitution of 1970. On August 20, 1979, we ordered cause No. 52366, a related action filed by a partnership entitled Chapel Hill Properties, to be consolidated with cause No. 52339. Relying primarily on article IX, section 3(a), of the Constitution, cause No. 52339 seeks invalidation of that portion of the Act which would impose an income tax on partnerships. On the basis of these constitutional claims, the petitioners in both causes seek an injunction to restrain the appropriate State officials from enforcing the Act. Because of the importance and urgency of the issue we expedited briefing and argument.

Appreciation of the constitutional challenges requires an examination of the Act's origin and purpose. Entitled "An Act in relation to the abolition of *ad valorem* personal property tax and the replacement of revenues lost thereby ***," it was enacted pursuant to article IX, section 5(c), of the 1970 Illinois Constitution, which provides:

> "On or before January 1, 1979, the General Assembly by law shall abolish all ad valorem personal property taxes and concurrently therewith and thereafter shall replace all revenue lost by units of local government and school districts as a result of the abolition of ad valorem

personal property taxes subsequent to January 2, 1971. Such revenue shall be replaced by imposing statewide taxes, other than ad valorem taxes on real estate, solely on those classes relieved of the burden of paying ad valorem personal property taxes because of the abolition of such taxes subsequent to January 2, 1971. If any taxes imposed for such replacement purposes are taxes on or measured by income, such replacement taxes shall not be considered for purposes of the limitations of one tax and the ratio of 8 to 5 set forth in Section 3(a) of this Article."

The General Assembly failed to provide a replacement for the *ad valorem* personal property tax prior to January 1, 1979. In *Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 230, we held that section 5(c) of article IX rendered the existing *ad valorem* personal property tax invalid after January 1, 1979, and constituted a continuing mandate to the General Assembly to enact a replacement tax. On June 30, 1979, the General Assembly passed House Bill 2569, which was an earlier version of the Act. Subsequently, the Governor exercised an amendatory veto over House Bill 2569 and the General Assembly in a special session approved his recommendations on August 6, 1979. Upon the Governor's certification of the General Assembly's actions, the Act became law on August 14, 1979.

The Act imposes two taxes. One is the replacement income tax, which increases the yearly corporate income tax rate from 4% to 6.85% until January 1, 1981, and to 6.5% thereafter. This tax subjects partnerships, trusts and corporations for which there is in effect for the taxable year an election under section 1372 of the Internal Revenue Code (subchapter S) to additional income taxes at an annual rate of 1.5%. The other tax is the invested capital tax, which subjects various public utilities to a yearly tax of 0.8% on invested capital. The Act further establishes the Personal Property Tax Replacement Fund, into which proceeds from both taxes will be placed.

The petitioners assert that the Act is unconstitutional

on several grounds. First, petitioners maintain that the Governor's exercise of his amendatory veto power exceeded the bounds of section 9(e) of article IV of the 1970 Illinois Constitution, which provides:

> "The Governor may return a bill together with specific recommendations for change to the house in which it originated. The bill shall be considered in the same manner as a vetoed bill but the specific recommendations may be accepted by a record vote of a majority of the members elected to each house. Such bill shall be presented again to the Governor and if he certifies that such acceptance conforms to his specific recommendations, the bill shall become law. If he does not so certify, he shall return it as a vetoed bill to the house in which it originated."

The Governor employed the amendatory veto to make the following recommendations: (1) reduction of the increase in the yearly corporate income tax from the 2.85% provided in House Bill 2569 to 2.5% for the period following January 1, 1981; (2) special provisions for taxpayers' returns affected by the rate change in the middle of a tax year; and (3) consistent treatment in the computation of base income and filing of returns for partnerships and subchapter S corporations. Only the first recommendation is challenged. Arguing that this recommendation involved more than a minor or technical change of House Bill 2569, petitioners maintain that the Governor's use of the veto power was unconstitutional. We disagree.

The extent of the Governor's amendatory veto power under section 9(e) of article IV was examined by this court in *People ex rel. Klinger v. Howlett* (1972), 50 Ill. 2d 242, 249. There, it was concluded that section 9(e)'s authorization of "specific recommendations for change" did not include the substitution of a completely new bill through the exercise of the amendatory veto power. While noting the existence of such words of limitation in the records of the constitutional convention as "corrections" and "pre-

cise corrections," a significant exchange in the debates was also noted. In response to Delegate Netsch's question: "Then was it the Committee's thought that the conditional veto would be available only to correct technical errors?", a committee member replied: "No Ma'am." (50 Ill. 2d 242, 249.) The absence of further clarification, of course, leaves unclear the drafter's intent as to the precise scope of the amendatory veto power.

While recognizing that constitutional debates often assist in comprehending the purpose of unclear constitutional provisions, we have emphasized that "the true inquiry concerns the understanding of its provisions by the voters who, by their vote, have given life to the product of the convention." (*Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 222, citing *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 527; *Wolfson v. Avery* (1955), 6 Ill. 2d 78, 88; *Burke v. Snively* (1904), 208 Ill. 328, 344; see also *Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117, 126.) In *Client Follow-Up Co. v. Hynes,* we relied to a significant extent on public comprehension of section 5(c) of article IX of the 1970 Constitution to determine that it abolished *ad valorem* taxes on personal property as of January 1, 1979. We inferred public understanding in part from views expressed in the press by persons who played significant roles in framing the 1970 Constitution and whose opinions would presumably carry great weight with voters. (75 Ill. 2d 208, 224-26.) Even less by way of inference is required to ferret out public understanding of section 9(e) of article IV, since the voters themselves have addressed the very question we now consider. By resolution of the General Assembly, a proposal for amending section 9(e) was submitted to the voters in 1974. That proposal would have altered the opening sentence of section 9(e) to read: "The Governor may return a bill together with specific recommendations for the correction of technical errors or matters of form to the House in which it originated." (H.J.

Res. Const. Amend. 7, 78th Gen. Assem.) This amendment was rejected by the voters in the 1974 referendum. When this public rejection of the proposed restriction is viewed along with the somewhat imprecise interpretation by the delegates, it is clear that section 9(e) of article IV was not intended by the voters to restrict the amendatory veto power to a proofreading device. Although the point beyond which the amendatory veto power does not extend is not as clear from the constitutional debates or referendum, that point is not, in our judgment, reached here. The specific recommendations made by the Governor regarding House Bill 2569 contain no change in the fundamental purpose of the legislation, nor are they so substantial or so expansive as to render his use of the veto power violative of section 9(e) of article IV.

Petitioners also assert that the Act violates section 5(c) of article IX of the 1970 Illinois Constitution insofar as the revenue to be collected under the replacement tax exceeds that which would have been collected under the personal property tax. The parties have stipulated that the replacement tax will raise $520 million in revenue during 1980 and that only $468 million would have been collected under the personal property tax in 1980. Petitioner contends that the difference of $52 million establishes that the replacement tax is a "revenue generating" rather than a "revenue replacing" tax as contemplated by section 5(c) of article IX.

In our judgment the contention must fail. Section 5(c) of article IX places an affirmative duty on the legislature to "replace all revenue lost by units of local government and school districts as a result of the abolition of ad valorem personal property taxes subsequent to January 2, 1971." While this language does not limit the legislature's replacement duty to the amount of *actual* revenue lost, as distinguished from *potential* revenue lost, such a limitation is supported by delegate commentary during the constitutional debates. When questioned as to the nature and rate

of the replacement tax, Delegate McCracken indicated an intention on the part of the drafters to "reimburse the local governments only for their actual lost revenue." (5 Record of Proceedings, Sixth Illinois Constitutional Convention 3835, hereinafter referred to as Proceedings.) Although this explanation was given in the context of a discussion of the replacement tax on corporate income, there is no indication of a contrary intention in the discussion of the companion replacement tax on invested capital. Accordingly, we view the mandate of section 5(c) of article IX to replace lost revenue as requiring replacement of the value of the amount collected rather than the amount extended under the personal property tax.

This construction does not, however, require a holding that section 5(c) of article IX requires a dollar-for-dollar replacement. The underlying objective of section 5(c) is to insure that local governmental entities and school districts receive operating funds sufficient to replace revenue lost through abolition of the personal property tax. (*Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 228, citing *Elk Grove Engineering Co. v. Korzen* (1973), 55 Ill. 2d 393, 404.) Also of fundamental concern, however, is that the revenue raised under the replacement tax not be permitted to undermine the 8-to-5 ratio of corporate to individual income tax specified in section 3(a) of article IX, a possibility which exists because section 5(c) of article IX exempts the replacement income tax from that ratio. The following exchange is illustrative:

"MR. WILSON: I just have one additional question I'd like to ask Mr. McCracken. I just wanted to be sure that I understood you correctly. Your proposal here [the 5(c) exemption] would not disturb the eight-to-five ratio provided in section 3, except that it would allow an additional tax measured by income solely and only for the purpose of providing these replacement funds. Is that correct?

MR. McCRACKEN: Well, not 'allow'; 'require.' Not 'allow'; 'require'—require an additional tax over and above

the eight-to-five.

MR. WILSON: Over and above it, but otherwise, the integrity of the eight-to-five ratio is preserved.

MR. McCRACKEN: Correct.

MR. WILSON: Thank you." 5 Proceedings 3836.

Clearly, the delegates involved in the drafting of section 5(c) of article IX recognized that their proposal was not free from problems. When asked whether the same amount of revenue would have to be raised from a particular class even though membership therein may decline, Delegate McCracken responded negatively:

"No. There are difficulties with this which you point out by your question, Mr. Knuppel, and there are even greater difficulties which we recognize.

Let me say that the answer to your question is no, but it's going to have to be determined by the legislature. It's not a categorical 'no' on my part. I would just anticipate that the legislature would use reason.

But let me point out something else, and perhaps even a more difficult result of this: In 1979, each district is going to get reimbursed 'X' dollars, because that's what the district raised in personal property tax in 1978. Suppose we continue to have inflation. Suppose these districts continue to grow and so on and so on and so on. We are not by this means compensating for those things, so this is a very imperfect solution." (5 Proceedings 3889.)

This passage demonstrates that it was not the intention of the drafters of section 5(c) of article IX to place the legislature in a straitjacket; rather, they recognized the economic uncertainties and inflationary trends and chose to give the General Assembly leeway to arrive at a reasonable replacement solution. We conclude that the anticipated amount of revenue to be raised under the Act is not so excessive as to constitute an unreasonable exercise of legislative discretion in carrying out the mandate of section 5(c) of article IX, particularly when the diminished purchasing power of a 1980 dollar is considered.

The year 1980 is the first year in which proceeds from the replacement tax will be realized, and a comparison of the estimated revenues for that year is likely to be the least distorted. In its final report, the Governor's Committee to Replace the Corporate Personal Property Tax indicated that the replacement tax was designed to raise only $460 million in 1980 because that represented the estimated amount of collection under the personal property tax for 1980. (Final Report of the Governor's Committee to Replace the Corporate Personal Property Tax 2 (Apr. 27, 1979).) The parties have stipulated, however, that the replacement tax would raise $520 million in 1980 and that the personal property tax would have raised $468 million in 1980. These differences demonstrate the extent to which the revenue projections, especially those pertaining to the replacement tax, are speculative. Given the fact that economic trends may significantly alter those projections, they become even less meaningful. However, even assuming that the projections to which the parties have stipulated are reasonably accurate, we do not find the difference of 10% in revenue collectible for 1980 so great as to transform the Act from the required revenue-replacing to a prohibited revenue-generating measure. The speculation inherent in these estimates, including the effect of continuing inflation, and the uncertainty of economic trends makes consideration of post-1980 projections of little or no value.

This determination effectively disposes of petitioners' next contention that, because the revenue collectible under the Act exceeds that which was collectible under the personal property tax, and because the excess is primarily attributable to the replacement tax on corporate income, the failure to observe the 8-to-5-ratio limitation in section 3(a) of article IX is not redeemed by the exemption to the ratio limitation in section 5(c) of article IX. That exemption is restricted by its language to taxes imposed on income for replacement purposes. Since we have deter-

mined that the replacement taxes do in fact function as *replacement* taxes, it necessarily follows that the replacement tax on corporate income qualifies for the exemption from the 8-to-5-ratio limitation as provided in section 5(c) of article IX.

Petitioners also challenge the requirement in section 5(c) of article IX that a replacement tax be imposed "solely on those classes relieved of the burden of paying ad valorem personal property taxes because of the abolition of such taxes subsequent to January 2, 1971." It is contended that the replacement tax violates this provision on the following grounds: some corporations, partnerships and trusts, such as those whose only asset is the capital stock of a corporation, incurred no liability under the personal property tax but now are subject to the replacement tax; partnerships owning only real property incurred no liability under the personal property tax but are now subject to replacement tax on income; the replacement tax does not reach many persons, such as some railroads, who have no taxable income, but who were subject to the personal property tax; there are allegedly large discrepancies between amounts imposed by the replacement tax and those levied by the personal property tax; and foreign-source income is subject to the replacement tax when it was exempt from the personal property tax.

Arguments involving the same issue and premised on the same requirement in section 5(c) of article IX were made in *American National Bank & Trust Co. v. Kusper* (1977), 69 Ill. 2d 374. The Act there under consideration attempted to exempt from the personal property tax all personal property held in trust for the exclusive benefit of a natural person. In invalidating the Act because the General Assembly failed to enact concurrently a replacement tax, we rejected the contention that a replacement tax was unnecessary since trusts were not currently being taxed in most counties and because the replacement tax would shift the burden to trusts previously exempt under

the personal property tax. We reasoned that "the fact that some trusts hold property previously exempt from *ad valorem* personal property taxation and the fact that trust assets change from time to time does not, in our view, render the imposition of a statewide replacement tax totally impossible as suggested by the plaintiffs." (69 Ill. 2d 374, 385.) While we deem it unnecessary to rule on the extent to which the replacement tax may impose tax liability on subjects previously exempt from the personal property tax, we do find that section 5(c) of article IX does not require in the replacement tax an exact correlation of persons and property taxed with those formerly subject to personal property tax. Such a result was specifically rejected by the drafters. Illustrative is the response to a proposal that the word "those" be substituted for the words "class or classes" in the section 5(c) sentence providing "Such revenue shall be replaced by imposing statewide taxes *** solely on those classes relieved of the burden of paying ad valorem personal property taxes ***." Delegate Cicero responded:

> "The language that Delegate Knuppel is suggesting was specifically avoided, because it raises an even more critical problem, and that is it is susceptible of the interpretation that each taxpayer has to pay the exact amount that he's relieved of. The idea then would be that every taxpayer relieved of whatever his last personal property assessment was, or some similar situation, would have to pay. The idea here was that they are not—that it not require an exact correlation on each taxpayer, since that gets you back into all the problems of assessment of the individual taxpayers under the personal property system; so I think that the language you are suggesting raises even more of a problem by narrowing the focus than does this language." (5 Proceedings 3889.)

This explicit defense of the language contained in the imposition restriction of section 5(c) precludes the narrow construction petitioners urge, for it is clear that the replacement tax was intended to be imposed broadly on those *classes* rather than on those particular persons

relieved of paying the personal property tax.

Moreover, the very provision in section 5(c) of article IX exempting a replacement income tax from the 8-to-5-ratio limitation reveals that a new form of property was intended to be taxed. Since a replacement tax imposed on the basis of *income* was expressly contemplated in section 5(c), we cannot agree that *only* those persons who incurred liability under the personal property tax were in fact the intended subjects of the replacement taxes. Certainly a tax imposed on the basis of income would not be expected to exempt those who had little or no personal property. Since it is conceded that the particular corporations and trusts forming the basis of petitioners' claim are within the classes defined under the replacement tax, and because we find the classes subject to the replacement tax sufficiently correlative to those classes subject to the personal property tax, as identified by this court in *Hanley v. Kusper* (1975), 61 Ill. 2d 452, 463, and *Lake Shore Auto Parts Co. v. Korzen* (1973), 54 Ill. 2d 237, 239, *cert. denied* (1973), 414 U.S. 1039, 38 L. Ed. 2d 329, 94 S. Ct. 539, we conclude that the class-imposition restriction in section 5(c) of article IX has not been violated.

The fact that railroads and other specified common carriers are exempted from that portion of the replacement tax which subjects the invested capital of utilities to taxation does not alter our conclusion. In order for this argument to succeed, petitioners must negate every conceivable basis which might support the challenged classifications. (*Williams v. City of Chicago* (1977), 66 Ill. 2d 423, 433, citing *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 364, 35 L. Ed. 2d 351, 358, 93 S. Ct. 1001, 1006; see also *Berry v. Costello* (1976), 62 Ill. 2d 342; *Johnson v. Halpin* (1952), 413 Ill. 257; *Reif v. Barrett* (1933), 355 Ill. 104.) We have previously upheld the separate classification of particular utilities for tax purposes against a uniformity-clause challenge in the absence of a showing that the classification was unrea-

sonable and arbitrary. (*Peoples Gas Light & Coke Co. v. City of Chicago* (1956), 9 Ill. 2d 348.) Too, railroads were treated differently from other regulated utilities under the personal property tax system insofar as utilities were subject to a separate personal property tax while railroads were subject to a tax on all the property they owned or used except for noncarrier real estate (Ill. Rev. Stat. 1977, ch. 120, par. 561).

While petitioners argue that the replacement corporate income tax includes foreign-source income of the corporation in violation of section 5(c) of article IX, it seems clear that since corporations were subject to personal property tax, they are a class within the scope of a replacement income tax and the source of that income is irrelevant unless excluded by the legislature.

That portion of petitioners' claim which challenges imposition of the replacement income tax on partnerships merits additional consideration. Petitioners contend that the Act violates section 3(a) of article IX by taxing the income of partnerships in addition to the income of individual partners. In considering petitioners' primary argument that the plain language of section 3(a) operates to exclude *partnership* income from taxation, we must consider section 3(a) in its entirety:

> "A tax on or measured by income shall be at a non-graduated rate. At any one time there may be no more than one such tax imposed by the State for State purposes on individuals and one such tax so imposed on corporations. In any such tax imposed upon corporations the rate shall not exceed the rate imposed on individuals by more than a ratio of 8 to 5." (Ill. Const. 1970, art. IX, sec. 3(a).)

Under petitioners' construction, only "corporations" and "individuals" may be taxed and only a single tax may be imposed on either; a tax on a partnership is not only unauthorized, it also constitutes double taxation of the individual. We find this construction, predominantly based

on negative implication, unsupported by a fair reading of the statute in conjunction with relevant portions of the constitutional debates. Nothing from our examination of the debates indicates that section 3(a) was so intended. As the following passages from delegates who participated in the drafting of section 3(a) reveal, this section was intended only to prevent the imposition of a graduated income tax:

"MR. DAVIS: *** [T]he sole purpose of this amendment [section 3(a) in an earlier but substantially similar form] is to make certain that the state will not, by superimposing one or more income taxes on a base income tax, create a graduated income tax situation." 3 Proceedings 1961.

"MR. CICERO: *** [I]t [section 3(a) in an earlier but substantially similar form] was intended simply to prevent the matter that Delegate Davis was concerned about and that is a series of taxes on individuals, perhaps embracing different income groups as a way of imposing a graduated income tax; and I think that is the sole objective of this sentence as to both individuals and corporations." 3 Proceedings 2113.

From our examination of relevant passages in the transcripts of the debates, we are unable to find any indication that the drafters of section 3(a) intended to exclude partnerships from the replacement income tax. In fact, a contrary intention is suggested from discussions concerning the contemplated replacement tax on income in section 5(c). In response to remarks concerning the classes upon which the replacement tax would be expected to fall, Delegate McCracken stated:

"I am talking about different types of taxpayers in the broadest or most generic sense. I am talking about corporations; I am talking about individuals, perhaps in their capacities as sole proprietors, perhaps in their capacities as *partners.* I am not sure whether I am talking about them or not, because I am not sure of the supreme court's interpretation of the term "individual"; but I may be talking about sole proprietors, *I may be talking about partnerships,* I definitely am talking about corporations, I

may be talking about trusts, and I may be talking about estates. That, I think, exhausts the possibilities." (Emphasis added.) (5 Proceedings 3889.)

As this passage indicates, the delegates were at least aware of the prospect that partnerships might be subject to the replacement tax on income. Having recognized that possibility, it seems only reasonable to assume that the drafters would have at least discussed excluding it if such were actually their intention. This assumption is grounded in an analogy to the exemption in section 5(c) of article IX of a replacement income tax from the 8-to-5-ratio limitation contained in section 3(a) of article IX. If, in fact, section 3(a) were intended to preclude taxation of partnership income, a similar exemption would have been needed in section 5(c) to permit its taxation. The fact that the delegates recognized that section 5(c) might be considered to permit such taxation and did not act to qualify section 3(a) is persuasive that it was not intended to preclude taxation of partnership income. We conclude that section 3(a) of article IX does not operate to exclude partnership income from the replacement tax.

Petitioners' claim that the Act subjects the income of an individual partner to two taxes in violation of section 3(a) of article IX is disposed of by the opinion of this court in *Lake Shore Auto Parts Co. v. Korzen* (1973), 54 Ill. 2d 237, 238, *cert. denied* (1973), 414 U.S. 1039, 38 L. Ed. 2d 329, 94 S. Ct. 539, where it was held that the personal property of a partnership is distinct from and, thus, taxable apart from the personal property of individual partners. (See also *Hanley v. Kusper* (1975), 61 Ill. 2d 452, 461.) Similarly, *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001, and *Hanley* are dispositive of the argument that taxing the income of an individual or corporate partner at a higher rate than an individual or corporation who is not a partner, and taxing the income of subchapter S corporations at a more favorable rate than that of other

corporations invalidates the Act. Though the uniformity requirement and equal protection clause of this State's constitution were not also raised in *Hanley*, the same result would obtain under these provisions, since petitioners have failed to carry their burden of proof that the classifications are arbitrary and unreasonable. *Williams v. City of Chicago* (1977), 66 Ill. 2d 423; *Jacobs v. City of Chicago* (1973), 53 Ill. 2d 421; *Thorpe v. Mahin* (1969), 43 Ill. 2d 36; *Grenier & Co. v. Stevenson* (1969), 42 Ill. 2d 289; *Doolin v. Korshak* (1968), 39 Ill. 2d 521.

Petitioners also seek invalidation of the Act on the grounds that the replacement tax on the invested capital of utilities is a prohibited *ad valorem* tax, fosters double taxation, and violates the uniformity and equal protection requirements of the State Constitution. We disagree with each of these claims.

As we earlier noted, the Act subjects utilities to an annual tax of 0.8% on "invested capital," which is defined as an "amount equal to (i) the average of the balances at the beginning and end of each taxable period of the taxpayer's total stockholder's equity and total long-term debt, less investments in and advances to all corporations, as set forth on the balance sheets included in the taxpayer's annual report to the Illinois Commerce Commission for the taxable period; (ii) multiplied by a fraction determined under Sections 301 and 304(a) of the 'Illinois Income Tax Act' and reported on the Illinois income tax return for the taxable period ending in or with the taxable period in question." (Ill. Rev. Stat. 1979, ch. 120, pars. 467.1, 467.16, 468, 1401.) Petitioners contend that a tax on invested capital so defined violates section 5(c) of article IX, which prohibits *ad valorem* property taxes. Because the amount of invested capital possessed by a utility allegedly bears a one-to-one relationship with the value of its assets, the replacement tax on invested capital

is said to rise and fall according to the value of a utility's assets. Consequently, petitioners maintain, the replacement tax on invested capital is an *ad valorem* tax. Petitioners liken this tax to a capital stock tax which, when imposed on the intangible assets of a corporation, has been deemed to be a tax on personal property. (*People ex rel. Little v. St. Louis Merchants Bridge Co.* (1919), 291 Ill. 95, 105; *Parsons v. East St. Louis Gas Light & Coke Co.* (1884), 108 Ill. 380, 382-83; *Cooper v. Corbin* (1882), 105 Ill. 224, 230; *Belleville Nail Co. v. People ex rel. Weber* (1880), 98 Ill. 399, 405-06.) Thus, petitioners conclude that the replacement tax on invested capital is an *ad valorem* tax on personal property.

In considering petitioners' allegations, we note that there is a presumption favoring the constitutional validity of a State's scheme of taxation, "and this presumption 'may be overcome only by a clear showing that it is arbitrary and unsupportable by any set of facts.' " (*Berry v. Costello* (1976), 62 Ill. 2d 342, 345, citing, *People ex rel. Kutner v. Cullerton* (1974), 58 Ill. 2d 266, 273.) Moreover, we again emphasize that " '[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' " (*Berry v. Costello* (1976), 62 Ill. 2d 342, 345, quoting *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 364, 35 L. Ed. 2d 351, 358, 93 S. Ct. 1001, 1006; see also *Williams v. City of Chicago* (1977), 66 Ill. 2d 423; *Johnson v. Halpin* (1952), 413 Ill. 257; *Reif v. Barrett* (1933), 355 Ill. 104.) Here, we conclude that petitioners have failed to carry their burden of proof since we find the replacement tax on invested capital sustainable as an excise tax.

In its final report, the Governor's Committee to Replace the Corporate Personal Property Tax described the replacement tax on the invested capital of particular utilities in the following manner:

"Telephone, gas and electric utilities will be subject

> to an increase in their existing occupational excise taxes equal to .75 percent of their invested capital (common equity, preferred equity and long-term debt) allocable to Illinois. This increase was agreed to in order to avoid the major shift which would occur if utilities were not made subject to a greater burden than other corporations since they presently pay a major portion of the corporate personal property tax." (Final Report of the Governor's Committee to Replace the Corporate Personal Property Tax 3 (Apr. 27, 1979).)

This supplemental tax on utilities was unanimously approved by the committee despite the assertion that the Act's taxation of invested capital rather than gross receipts diminishes the tax's character as a privilege tax. We note that the committee specifically avoided a tax on gross receipts by reasoning that it "would cause drastic shifts in the incidence on different utilities or necessitate differential rates, raising questions of equity." Final Report of the Governor's Committee to Replace the Corporate Personal Property Tax 1 (Apr. 27, 1979).

Furthermore, in distinguishing this tax on invested capital from a property tax, we note that the tax is levied apart from any participation of an assessor, since it is computed on the basis of a utility's currently reported book values, rather than its market value, which may vary widely. This tax on invested capital is distinguishable from the old Illinois capital stock tax, which was deemed a property tax inasmuch as it directly taxed intangible assets and was assessed by law on the basis of fair cash value rather than book value. (See, *e.g., People ex rel. Little v. St. Louis Merchants Bridge Co.* (1919), 291 Ill. 95, 105; *Parsons v. East St. Louis Gas Light & Coke Co.* (1884), 108 Ill. 380, 382-83; *Cooper v. Corbin* (1882), 105 Ill. 224, 230; *Belleville Nail Co. v. People ex rel. Weber* (1880), 98 Ill. 399, 405-06.) Even if we were to regard invested capital as property, however, it is not directly taxed under the Act. The taxing scheme under the Act

falls instead on those utilities "engaged in" or who have a "right to engage in" specified activities. (Ill. Rev. Stat. 1979, ch. 120, pars. 467.2a.1, 467.17a.1, 469a.1, 1401.) That the tax is *measured* by a utility's invested capital does not render it a property tax, since it is in all significant respects a tax imposed on the privilege of engaging in specified occupations. Other jurisdictions have likewise determined that similar tax schemes amount to privilege rather than property taxes. In *Scott-Rice Co. v. Oklahoma Tax Com.* (Okla. 1972), 503 P.2d 208, it was argued that a tax on "the amount of capital used, invested or employed" (503 P.2d 208, 210) by specified business organizations within the State violated a State constitutional provision prohibiting any *ad valorem* tax for State purposes upon any kind of property. However, because the tax on invested capital was held not to be a tax on the assets, or on the transfer of or income from the assets of the specified business organizations, the court found the tax to be a privilege rather than a property tax. See also *Southern Realty Corp. v. McCallum* (5th Cir. 1933), 65 F.2d 934, 935-36, *cert. denied* (1933), 290 U.S. 692, 78 L. Ed. 596, 54 S. Ct. 127; *United North & South Development Co. v. Heath* (Tex. Civ. App. 1934), 78 S.W.2d 650, 652 (construing same tax as in *McCallum*).

Even assuming, *arguendo,* that the replacement tax on invested capital is a property tax, we are unconvinced that it is an *ad valorem* property tax. Petitioners would have us believe that "invested capital" as defined under the Act bears a direct one-to-one relationship with the value of a utility's assets. However, we fail to see how the Act's scheme of assessment would necessarily cause invested capital to change in direct relation to any rise or fall in the value of a utility's assets. Since the method of taxation under the Act does not assign a cash value to utility

property and then levy a tax on that value, it does not amount to an *ad valorem* mode of taxation.

We find petitioners' claim of double taxation to be without merit. That claim is based on the fact that taxpayers subject to the replacement tax on invested capital would pay taxes on the value of real estate twice in the same year to the extent that their invested capital is held in the form of real estate. However, since we have found the tax on invested capital to be a tax on the privilege of engaging in specified business occupations, there is no double taxation simply because there is another tax directly on the property. See, *e.g., City of Chicago v. Willett Co.* (1953), 1 Ill. 2d 311, 314; *Bardon v. Nudelman* (1938), 369 Ill. 214, 217-18; *People v. Deep Rock Oil Corp.* (1931), 343 Ill. 388, 394-95.

Petitioners also allege that the Act is constitutionally defective insofar as it addresses more than one subject. Article IV, section 8(d), of the 1970 Constitution provides in pertinent part: "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject. Appropriations bills shall be limited to the subject of appropriations." In applying this section and its predecessor in article IV, section 13, of the Constitution of 1870, this court has interpreted this requirement to mean that matters covered in a bill must be germane to a general subject and those matters must be naturally and logically connected with each other. (*People ex rel. Ogilvie v. Lewis* (1971), 49 Ill. 2d 476, 487; *Jordan v. Metropolitan Sanitary District* (1958), 15 Ill. 2d 369, 375; *People ex rel. Gutknecht v. City of Chicago* (1953), 414 Ill. 600, 607-08.) Under this interpretation, we find the provisions of this act directly connected with and germane to the subject of replacing the *ad valorem* personal property tax, and an appropriate legislative response to the comprehensive mandate set forth in section 5(c) of article IX. Nor is the Act's allocation of revenue between Cook and other counties throughout the State violative of the provision in section 8(d) of article IV

requiring appropriations bills to be confined to the subject of appropriations. Rather than transforming the entire act into an appropriations bill, the allocation specified for the personal property tax replacement fund (Ill. Rev. Stat. 1979, ch. 85, par. 616) simply attempts to insure proportionate replacement of lost revenue to taxing bodies throughout the State as required by section 5(c) of article IX. Petitioners contend that this specified allocation unfairly apportions revenues from the replacement tax, since, they argue, it fails to replace revenue lost in some areas of the State but distributes a surplus to Cook County, and violates section 5(c)'s mandate to replace revenues lost by units of local government and school districts. Those contentions, however, are based on a comparison of the Act's allocation formula to actual personal property tax collections for 1977. No consideration is given to delinquencies or to immediately preceding years for which the distribution of receipts from personal property tax collections correspond closely to the Act's allocation. Moreover, the Act provides for minimum replacement guarantees of lost revenues to taxing districts throughout the State. (Ill. Rev. Stat. 1979, ch. 85, par. 616.) The Act's allocation formula does not violate section 5(c) of article IX.

Additionally, petitioners contend that the General Assembly has exceeded its legislative authority by restricting the classification of real and personal property by adding section 18.1 to the Revenue Act of 1939:

> "No property lawfully assessed and taxed as personal property under this Act prior to January 1, 1979, shall be classified as real property subject to assessment and taxation under this Act after January 1, 1979. No property lawfully assessed and taxed as real property under this Act prior to January 1, 1979, shall be classified as personal property subject to assessment and taxation under this Act after January 1, 1979." (Ill. Rev. Stat. 1979, ch. 120, par. 499.1.)

Specifically, petitioners maintain that this restriction on classification encroaches on the powers of the judiciary to

determine what constitutes real property for purposes of article IX, section 4, and what is personal property for purposes of article IX, section 5(c). Such is not the case, however, for the classification restriction is premised on the word "lawfully," which defers to judicial authority. (See, *e.g., Smiley v. East St. Louis & Suburban Ry. Co.* (1912), 256 Ill. 482, 486.) We also note that section 4(b) of article IX specifically conditions its classification framework of real property on "such limitations as the General Assembly may hereafter prescribe by law."

The legislative debates reveal that the primary purpose of this restriction on property classification is to prevent the new tax from exceeding its replacement function. As the sponsor of this provision reasoned:

> "This was meant as a replacement and not as a new tax. And, therefore, any property lawfully assessed as personal property under the Act prior to January 1st could not be reclassified as real property and also any property not, or any property lawfully assessed and taxed as real property prior to January 1st could not then be reclassified as personal property. We don't want a wholesale switch back and forth. There may be some isolated circumstances where indeed a piece of property was unlawfully classified. In that case it could, the classification could be changed, but I think it would be challenged in court and they would have to show that prior to the reclassification that it was indeed unlawfully classified." (81st Gen. Assem., 1st Sp. Sess. 11 (Aug. 6, 1979).)

We find nothing in this restriction which usurps judicial authority or otherwise exceeds the bounds of legislative authority.

Petitioners contend that the Act violates due process to the extent that the replacement taxes apply retroactively. Though the Act did not become effective until August 14, 1979, it imposes a tax for the period beginning July 1, 1979. After holding that a retroactive tax is not *per se* unconstitutional, the United States Supreme Court stated that "[i]n each case it is necessary to consider the nature of the tax and the circumstances in which it is laid

before it can be said that its retroactive application is so harsh and oppressive as to transgress the constitutional limitation." (*Welch v. Henry* (1938), 305 U.S. 134, 147, 83 L. Ed. 87, 93, 59 S. Ct. 121, 126.) There, the tax was held not to offend due process even though it was given retroactive application for 27 months. Since the period of retroactivity here is only 45 days, the classes taxed are relieved of the abolished personal property tax, and notice was at least constructively provided by the replacement tax provision of section 5(c) of article IX of the 1970 Constitution and our earlier decisions, we hold that the Act's retroactivity is not constitutionally impermissible.

For these reasons we hold that Public Act 81—1SS—1 is constitutional. The prayers that its enforcement be enjoined are denied.

*Injunction denied.*

MR. JUSTICE CLARK, concurring in part and dissenting in part:

I concur in part and dissent in part. It is my belief that article IX, section 3(a), of the 1970 Constitution (Ill. Const. 1970, art. IX, sec. 3(a)) proscribes double taxation, and that the replacement tax, because it authorizes double taxation as to partnership income, contravenes that constitutional provision.

Article IX, section 3(a), states:

> "Section 3. LIMITATIONS ON INCOME TAXATION
>
> (a) A tax on or measured by income shall be at a non-graduated rate. At any one time there may be no more than one such tax imposed by the State for State purposes on individuals and one such tax so imposed on corporations. In any such tax imposed upon corporations the rate shall not exceed the rate imposed on individuals by more than a ratio of 8 to 5."

The second sentence of section 3 undeniably is addressed to prohibiting the imposition of more than one tax on the income of an individual or a corporation. Double taxation has been defined by this court to mean

"taxing twice, for the same purpose, in the same year, some of the property in the territory in which the tax is laid, without taxing all of it a second time." (*People ex rel. Toman v. Advance Heating Co.* (1941), 376 Ill. 158, 163.) Close scrutiny of the replacement income tax as it applies to partnerships reveals that it falls foursquare within the foregoing definition.

The majority opinion asserts that the replacement income tax does not tax partnership income twice based on *Lake Shore Auto Parts Co. v. Korzen* (1973), 54 Ill. 2d 237, *cert. denied* (1973), 414 U.S. 1039, 38 L. Ed. 2d 329, 94 S. Ct. 539. That case, however, distinguished between taxes on partnership personal property and on individual partner's personal property. It may clearly be seen that those two types of property are different. The personal property of a partnership would presumably consist of the articles needed to operate the partnership's business, such as vehicles, inventory, office furniture, and equipment. That property would be quite different from each individual partner's privately owned personal property. Recognition of the fact that the two types of property are separable is implicit in the holding in that case that *ad valorem* personal property taxes may be levied upon partnership personal property but not upon personal property owned by a natural person. (54 Ill. 2d 237, 239.) But that distinction does not hold true as to income. Clearly, income earned by the partnership is precisely the same income which is distributed to the partners. Thus, it is irrefutable herein that if the income is the same, it is being taxed twice: once when the partnership realizes the income by means of the replacement income tax, and a second time when the partners receive it, in the form of the State personal income tax.

The "same purpose" requirement is met, as demonstrated by the fact that both the replacement income tax and the personal income tax have the general purpose of generating operating revenue for the State and its various

subdivisions. The fact that one tax is a replacement tax does not alter its purpose. Certainly the two taxes are being levied and collected in the same year.

The last element is also satisfied since it is only income derived from partnerships which is being doubly taxed, and not corporate or individual income. It has been established that if all taxpayers were taxed twice in a uniform manner, such a tax would not be double taxation, but merely the same as levying twice as large a tax on every taxpayer in the first place. (*Independent School District v. Iowa Employment Security Com.* (1946), 237 Iowa 1301, 1309, 25 N.W.2d 491, 497.) It is only when the two taxes are not applied uniformly to all property that double taxation results. That is clearly the case here as to income derived from partnerships.

A similar situation was presented to this court in *People ex rel. Abt v. Wiggins Ferry Co.* (1913), 257 Ill. 452. The owner of a tract of land in St. Clair County leased it to a railway company. The railway company was assessed by the State Board of Equalization for its right-of-way for the year 1911 and paid the taxes accruing thereon. Later the county assessor made an assessment on the entire tract. The owner of the land objected to the assessment on that portion of the premises used by the railway as a right-of-way, claiming that it resulted in a "double assessment." The owner's contention was upheld, the court stating that the right-of-way had been subjected to a double assessment for the year 1911. The owner had the right to object to the payment of any taxes levied against it upon the same property by virtue of an assessment by the local assessor. 257 Ill. 452, 458.

To the same effect is *Sanitary District v. Young* (1918), 285 Ill. 423. There a personal property tax was levied against the sanitary district upon its transmission lines, which consisted of wooden poles and steel towers set in concrete bases, upon which wires were stretched. The sanitary district argued that since these facilities were real

property, for which real estate taxes were paid, a personal property tax assessed against them would result in double taxation. After reaching the conclusion that the facilities were indeed real property and, as such, subject to real estate taxes, the court agreed with the sanitary district's argument and reinstated that portion of the bill of equity which had been dismissed by the chancellor.

Finally, in *New York Central R.R. Co. v. Stevenson* (1917), 277 Ill. 474, this court held that where two taxes were imposed on the issuance of capital stock pursuant to two different acts, the later act would be considered to have superseded the earlier act. The rule was invoked that "double taxation will never be presumed, and before that effect will be given a statute it must unmistakably appear that the legislature so intended it." (277 Ill. 474, 481.) The court stated that to hold that "payment is required under the Incorporation Fee act and also under section 31 of the Public Utilities act is double taxation ***." (277 Ill. 474, 483.) Instead the court decided that the intent of the legislature was to require that the tax be paid pursuant to the Public Utilities Act and "that section 31 of the Public Utilities act operated to repeal the Incorporation Fee act as applied to corporations of the character of the appellee." 277 Ill. 474, 483.

The same construction could have been employed in this case. We should not presume that the legislature intended to impose a double tax on income earned by partnerships, but rather that the replacement tax, as applied to partnerships, repeals the section of the personal income tax act which taxes a partner's personal income. That would be the result which would be in conformity with article IX, section 3(a), of the 1970 Constitution. As the majority has interpreted it, the replacement income tax act contravenes section 3(a) because it authorizes double taxation on income derived from partnerships.

In all other respects I concur in the majority opinion.

MR. JUSTICE RYAN joins in this partial concurrence and partial dissent.

MR. JUSTICE MORAN, dissenting:

While I concur with Mr. Justice Clark's dissent in respect to the double taxation of partnership income in contravention of article IX, section 3(a), of the 1970 Constitution (Ill. Const. 1970, art. IX, sec. 3(a)), I additionally dissent on the broader basis of the authority of this court to entertain original jurisdiction in this case.

It is well established that this court may assert original jurisdiction in cases relating to revenue only if the issues involved are purely legal in nature (73 Ill. 2d R. 381), and then only if actual facts are before us. (*People ex rel. Jones v. Robinson* (1951), 409 Ill. 550, 555; *People ex rel. Ward v. Moran* (1973), 54 Ill. 2d 552, 557.) In the present case, the parties stipulate that the replacement tax will raise $520 million in revenue in 1980 as opposed to only $468 million which would have been collected under the former personal property tax had it remained in existence. It is not binding upon this court that the parties have stipulated to facts and agree that only issues of law remain. If the court finds that the determination of factual issues is necessary to relief, it will refuse to assert original jurisdiction. (*Touhy v. State Board of Elections* (1975), 62 Ill. 2d 303, 312.) Clearly, the projection of the amount of revenue is, as admitted by the majority opinion, "of little or no value" due to the uncertainty of future economic events. Until the amount of revenue for 1980 can be computed with accuracy, the plaintiff's claims involve an unsubstantiated factual issue which bars this court's ability to assert original jurisdiction.

Furthermore, to bring an action for declaratory judgment, there must be an actual controversy. This court cannot be required "to pass judgment on mere abstract propositions of law, render an advisory opinion,

420

or give legal advice as to future events." (*Underground Contractors Association v. City of Chicago* (1977), 66 Ill. 2d 371, 375; *Dean Milk Co. v. City of Aurora* (1949), 404 Ill. 331, 334.) If an event upon which the issue is based may or may not occur, there is no controversy, and a decision regarding such hypotheticals would amount to an advisory opinion. (*Dee-El Garage, Inc. v. Korzen* (1972), 53 Ill. 2d 1, 11; *Exchange National Bank v. County of Cook* (1955), 6 Ill. 2d 419, 422.) Here, because the amount of revenue to be gained under the future replacement tax is unknown, and is therein based upon pure conjecture, the action is prematurely filed and, in fact, no actual controversy exists.