ILLINOIS POWER COMPANY, Plaintiff-Appellant, *v.* J. THOMAS JOHNSON, Director of Revenue, Department of Revenue, *et al.*, Defendants-Appellees.

Fourth District   No. 4—82—0727

Opinion filed July 12, 1983.

GREEN, J., dissenting.

Owen E. MacBride and Janet M. Johnson, both of Schiff, Hardin & Waite, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Imelda R. Terrazino, Assistant Attorney General, of counsel), for appellees.

JUSTICE MILLS delivered the opinion of the court:
Gas Revenue Tax Act interpretation.
What is the definition of "total long term debt" as a component of "invested capital"?

Illinois Power and the Department of Revenue could not agree. The trial court sided with Revenue.

We hold with Illinois Power.

*Ergo,* we reverse and remand.

Section 2a.1 of the Gas Revenue Tax Act (Ill. Rev. Stat. 1981, ch. 120, par. 467.17a.1) imposes a tax on those utilities subject to the Act, "in an amount equal to .8% of [such utility's] invested capital for the taxable period." The tax was enacted as one of the replacement taxes for the personal property tax and became effective July 1, 1979. The tax is in addition to those imposed by the State on income and gross receipts.

On April 3, 1981, plaintiff Illinois Power Company, a utility subject to the Act, filed suit in the circuit court of Sangamon County against defendants, J. Thomas Johnson and Jerry Consentino, in their capacities as Director of Revenue of the Department of Revenue, and State Treasurer, respectively, seeking injunctive relief against portions of the tax which were assessed against it for the calendar year 1980. Plaintiff paid, under protest, the portion of the tax in dispute before filing suit. The complaint requested that Director Johnson and his agents be enjoined from depositing the money paid under protest into the State treasury and from taking any action against plaintiff for those funds. The complaint also requested that Treasurer Consentino be ordered to refund to plaintiff any funds paid under protest that had been received by the treasurer.

The trial court granted certain temporary relief, but, after a bench trial, it entered an order on October 19, 1982, denying the permanent relief requested. Plaintiff appeals. We reverse.

Section 1 of the Act defines "invested capital" as:

> "that amount equal to (i) the average of the balances at the beginning and end of each taxable period of the taxpayer's total stockholder's equity and *total long-term debt,* less investments in and advances to all corporations, *as set forth on the balance sheets* included in the taxpayer's *annual report to* the Illinois Commerce Commission for the taxable period; (ii) multiplied by a fraction determined under [the Illinois Income Tax Act]."

(Emphasis added.) (Ill. Rev. Stat. 1981, ch. 120, par. 467.16.)

Section 1 also defines "taxable period" as "each period which ends after the effective date of this Act and which is covered by an annual report filed by the taxpayer with the Illinois Commerce Commission." (Ill. Rev. Stat. 1981, ch. 120, par. 467.16.) Plaintiff files this report on a calendar year basis. The pertinent forms of the report are here set forth:

110

Annual report of ................................ ILLINOIS POWER COMPANY ........................ Year ended December 31, 19<u>80</u>.

COMPARATIVE BALANCE SHEET

Assets and Other Debits

| Line No. | Title of Account (a) | Page No. (b) | Balance Beginning of Year (c) | Balance End of Year (d) | Increase or (Decrease) (e) |
|---|---|---|---|---|---|
| 1 | **UTILITY PLANT** | | $ | $ | $ |
| 2 | Utility Plant (101-107, 114) ................... | 113 | 2541,982,284 | 2827,827,858 | 285,845,574 |
| 3 | Less Accumulated Provisions for Depreciation, Amortization, | | | | |
| 4 | and Depletion (108-113, 115) .................. | 113 | 556,714,374 | 607,375,335 | 50,660,961 |
| 5 | Net Utility Plant ............ ................ | | 1985,267,910 | 2220,452,523 | 235,184,613 |
| 6 | Other Utility Plant Adjustments (116) .............. | 112 | − | − | − |
| 7 | Nuclear Fuel (120) | | 18,261,674 | 39,428,847 | 21,167,173 |
| 8 | **OTHER PROPERTY AND INVESTMENTS** | | 2003,529,584 | 2259,881,370 | 256,351,786 |
| 9 | Nonutility Property (121) (less Accumulated Depreciation and | | | | |
| 10 | Amortization included in (122), ($111,953 ) ........ | | 355,321 | 334,792 | ( 20,529) |
| 11 | Investment in Associated Companies (123) ............ | 201 | 1,240,000 | 1,240,000 | − |
| 12 | Other Investments (124) ......................... | 201 | 7,030,905 | 6,981,617 | ( 49,288) |
| 13 | Special Funds (125-128) ......................... | 202 | 36,552 | 39,303 | 2,751 |
| 14 | Total Other Property and Investments ........... | | 8,662,778 | 8,595,712 | ( 67,066) |
| 15 | **CURRENT AND ACCRUED ASSETS** | | | | |
| 16 | Cash (131) .......................... | | 10,313,131 | 10,087,399 | ( 225,732) |
| 17 | Special Deposits (132-134) ... .... .... | 202 | 164,052 | 290,692 | 126,640 |
| 18 | Working Funds (135) ...................... | | 58,235 | 62,621 | 4,386 |
| 19 | Temporary Cash Investments (136) ............ | 201 | 2,500,000 | 6,000,000 | 3,500,000 |
| 20 | Notes and Accounts Receivable (141-143) (Less Accumu- | | | | |
| 21 | lated Provision for Uncollectible Accounts—Credit (144) ... | 203 | 74,843,436 | 67,274,186 | ( 7,569,250) |
| 22 | Receivables from Associated Companies (145, 146) ..... | 205 | − | − | − |
| 23 | Materials and Supplies (151-159, 163) ............. | 206 | 82,936,550 | 90,487,702 | 7,551,152 |
| 24 | Gas Stored Underground (164) .................... | 208 | 26,645,874 | 17,388,120 | ( 9,257,754) |
| 25 | Prepayments (165) ............................ | 209 | 9,291,964 | 11,942,659 | 2,650,695 |
| 26 | Interest and Dividends Receivable (171) ............ | | 4,407 | 899 | ( 3,508) |
| 27 | Rents Receivable (172) ......................... | | 3,399 | − | ( 3,399) |
| 28 | Accrued Utility Revenues (173) ... .. ......... | | − | − | − |
| 29 | Miscellaneous Current and Accrued Assets (174) ....... | 209 | − | − | − |
| 30 | Total Current and Accrued Assets ............ | | 206,761,048 | 203,534,278 | ( 3,226,770) |
| 31 | **DEFERRED DEBITS** | | | | |
| 32 | Unamort. Debt Discount and Expense (181) .......... | 210 | 8,231,919 | 9,768,185 | 1,536,266 |
| 33 | Extraordinary Property Losses (182) .............. | 207 | − | − | − |
| 34 | Preliminary Survey and Investigation Charges (183) ...... | 211 | − | − | − |
| 35 | Clearing Accounts (184) ....................... | 212 | 276,859 | 291,417 | 14,558 |
| 36 | Temporary Facilities (185) ...................... | | 32,016 | 18,308 | ( 13,708) |
| 37 | Miscellaneous Deferred Debits (186) .............. | 213 | 5,837,927 | 7,051,940 | 1,214,013 |
| 38 | Total Deferred Debits ...................... | | 14,378,721 | 17,129,850 | 2,751,129 |
| 39 | Total Assets and Other Debits ...................... | | 2233,332,131 | 2489,141,210 | 255,809,079 |

# 622

## COMPARATIVE BALANCE SHEET
### Liabilities and Other Credits

| Line No. | Title of Account (a) | Page No. (b) | Balance Beginning of Year (c) | Balance End of Year (d) | Increase or (Decrease) (e) |
|---|---|---|---|---|---|
| 1 | PROPRIETARY CAPITAL | | $ | $ | $ |
| 2 | Common Stock Issued (201) | 214 | 490,539,094 | 572,684,786 | 82,145,692 |
| 3 | Preferred Stock Issued (204) | 214 | 214,000,000 | 250,000,000 | 36,000,000 |
| 4 | Capital Stock Subscribed (202, 205) | 215 | – | | |
| 5 | Stock Liability for Conversion (203, 206) | 215 | – | – | – |
| 6 | Premium on Capital Stock (207) | 215 | 1,170,940 | 1,170,940 | – |
| 7 | Other Paid-In Capital (208-211) | 216 | – | – | – |
| 8 | Installments Received on Capital Stock (212) | 215 | – | – | – |
| 9 | Discount on Capital Stock (213) | 217 | – | – | – |
| 10 | Capital Stock Expense (214) | 217 | ( 3,795,059) | ( 4,639,524) | ( 844,465) |
| 11 | Earned Surplus (215, 216) | 116 | 168,552,833 | 183,059,971 | 14,507,138 |
| 12 | Reacquired Capital Stock (217) | 214 | | | |
| 13 | Total Proprietary Capital | | 870,467,808 | 1,002,276,173 | 131,808,365 |
| 14 | LONG-TERM DEBT | | | | |
| 15 | Bonds (221) (less $ None reacquired) (222) | 218 | 882,200,000 | 997,200,000 | 115,000,000 |
| 16 | Advances from Assoc. Companies (223) | 218 | – | – | – |
| 17 | Other Long-Term Debt (224) | 218 | 398,284 | 123,107 | ( 275,177) |
| 18 | Total Long-Term Debt | | 882,598,284 | 997,323,107 | 114,724,823 |
| 19 | CURRENT AND ACCRUED LIABILITIES | | | | |
| 20 | Notes Payable (231) | 219 | 34,145,000 | – | (34,145,000) |
| 21 | Accounts Payable (232) | | 87,816,021 | 65,013,998 | (22,802,023) |
| 22 | Payables to Assoc. Companies (233, 234) | 219 | | | |
| 23 | Customer Deposits (235) | | 809,873 | 1,128,680 | 318,807 |
| 24 | Taxes Accrued (236) | 220 | 21,546,825 | 34,719,791 | 13,172,966 |
| 25 | Interest Accrued (237) | | 21,510,760 | 28,716,389 | 7,205,629 |
| 26 | Dividends Declared (238) | | 20,822,948 | 25,647,841 | 4,824,893 |
| 27 | Matured Long-Term Debt (239) | | – | – | – |
| 28 | Matured Interest (240) | | – | – | – |
| 29 | Tax Collections Payable (241) | | 146,068 | ( 278,857) | ( 424,925) |
| 30 | Miscellaneous Current and Accrued Liabilities (242) | 221 | 5,037,912 | 5,746,036 | 708,124 |
| 31 | Total Current and Accrued Liabilities | | 191,835,407 | 160,693,878 | (31,141,529) |
| 32 | DEFERRED CREDITS | | | | |
| 33 | Unamortized Premium on Debt (251) | 210 | 141,403 | 115,440 | ( 25,963) |
| 34 | Customer Advances for Construction (252) | 221 | 3,026,625 | 3,156,455 | 129,830 |
| 35 | Other Deferred Credits (253) (254, 255) | 222 | 121,153,377 | 139,339,212 | 18,185,835 |
| 36 | Total Deferred Credits | | 124,321,405 | 142,611,107 | 18,289,702 |
| 37 | OPERATING RESERVES | | | | |
| 38 | Property Insurance Reserve (261) | 223 | – | – | – |
| 39 | Injuries and Damages Reserve (262) | 223 | – | – | – |
| 40 | Pensions and Benefits Reserve (263) | 223 | – | – | – |
| 41 | Amortization Reserve-Federal (264) | 223 | – | – | – |
| 42 | Miscellaneous Operating Reserves (265) | 223 | – | – | – |
| 43 | Total Operating Reserves | | – | – | – |
| 44 | CONTRIBUTIONS IN AID OF CONSTRUCTION | | | | |
| 45 | Contributions in Aid of Construction (271) | 223 | 14,111,434 | 16,036,325 | 1,924,891 |
| 46 | ACCUMULATED DEFERRED INCOME TAXES | | | | |
| 47 | Accumulated Deferred Income Taxes: | | | | |
| 48 | Accelerated Amortization (281) | 224 | 5,257,000 | 4,822,000 | ( 435,000) |
| 49 | Liberalized Depreciation (282) | 224 | 88,758,000 | 95,074,000 | 6,316,000 |
| 50 | Other (283) | 224 | 55,982,793 | 70,304,620 | 14,321,827 |
| 51 | Total Accumulated Deferred Income Taxes | | 149,997,793 | 170,200,620 | 20,202,827 |
| 52 | Total Liabilities and Other Credits | | 2,233,332,131 | 2,489,141,210 | 255,809,079 |

The dispute between the parties concerns the calculation of items to be considered in determining the "total long-term debt" component of "invested capital" under the provisions of section 2a.1. Plaintiff maintains that certain adjustments should be made to the total face amount of bonds outstanding to obtain a true "total long-term debt" balance. It would make (1) a subtraction for the unamortized discount and expense which it incurred upon the issuance of bonds, and (2) an addition for the unamortized premium realized from the issuance of bonds. Defendants maintain that no such adjustments should be made. For the year 1980, plaintiff's tax was assessed at an amount $32,362.06 higher than it would have been had its method of computation been used. That sum was paid under protest.

When a corporation such as plaintiff floats a bond issue, a usual method is to offer bonds of a particular maturity at a stated face amount and interest rate. The bonds are then bid upon and sold for an amount that usually varies from the face amount of the bonds, creating an effective interest rate that is either greater or less than that stated on the bonds. If the bonds are sold at a greater price than the face amount, they are said to have been sold at a premium. If sold at a lower price, they are said to have been sold at a discount. Under generally accepted accounting principles and under the requirements of the Illinois Commerce Commission, the premium or discount and the expenses of the issuance of the bonds are amortized over the life of the bonds. The amortization of the discount and costs of issuance constitute expenses and the amortization of the premium constitutes income.

Plaintiff contends that it is necessary to make the adjustments it proposes to determine a true amount for "invested capital" because: (1) Money spent for the expenses of the issuance of bonds is not available for the purchase of assets for the corporation; (2) if bonds are issued at a discount, the full face amount of the bonds is never received by the corporation; (3) when bonds are issued at a premium, a sum in excess of the face amount of the bonds is received by the corporation, and unless used for expenses of issuance, is available for investment in assets.

The gradual amortization of the debit account of bond discounts and expenses decreases stated profits, thereby decreasing "stockholder's equity," while at the same time true long-term debt would be increasing by the same amount. The reverse is true for amortization of premiums. Plaintiff's theory was supported by the undisputed testimony of accounting experts that, under generally accepted accounting principles, to determine actual "invested capital," the face amount of

the bonds would be so adjusted. Evidence was also presented that for the purpose of determining invested capital for setting utility rates, and for determining plaintiff's need for capital when approving the issuance of bonds, the Commerce Commission makes such adjustments to the bond accounts.

Defendants' contention that plaintiff's "invested capital" was properly computed and the tax properly assessed is based on (1) the statutory requirement that "invested capital" includes the "total long-term debt *** as set forth on the balance sheets" in plaintiff's annual report to the Commission, and (2) the providing by the Commission, and use by the plaintiff, of balance sheets and supporting documents which (a) contained a category in the exact words of the statute, i.e., "total long-term debt," and made no reference to unamortized discounts or premiums on the issuance of that debt or the unamortized expenses of its issuance, and (b) listed those latter items in other categories.

The issue thus becomes whether the legislature intended that "invested capital" be determined (1) by taking figures from the balance sheets referred to and then arranging the figures in such a manner as to make the determination consistent with accepted accounting principles and the practice of the Commerce Commission, as asserted by plaintiff, or (2) by accepting and using those figures in the format in which they are presented on the balance sheets, as asserted by defendants.

The balance sheets submitted by plaintiff to the Illinois Commerce Commission for the year ended December 31, 1980, were on forms provided by the Commission. Accompanying instructions gave the following statement:

> "This form of annual report is prepared in conformity with the applicable uniform system of accounts and all of the accounting terminology used herein is in accordance therewith."

The first page of the balance sheet forms lists "Assets and Other Debits." One heading is labeled "DEFERRED DEBITS." Under it is listed line items for "Unamort. Debt Discount and Expense" and such items as "Extraordinary Property Losses" and "Clearing Accounts." There is a line for "Total Deferred Debits" and the total from that line is used in the computation of "Total Assets and Other Debits." The second page lists "Liabilities and Other Credits." One of its headings is labeled "LONG-TERM DEBT." Under that heading are line items for (1) "Bonds" where the total face amount of existing long-term bonds is listed, (2) "Advances from Assoc. Companies," and (3) "Other Long-Term Debt." The sum of these items is then listed as

"Total Long-Term Debt." On the same page, under the heading "DE-FERRED CREDITS" there is a line item for "Unamortized Premium on Debt." The sums of these two headings are included in the computation of "Total Liabilities and Other Credits."

The "Uniform System of Accounts for Gas Utilities" adopted by the Illinois Commerce Commission by General Order 179, as revised, was offered by plaintiff and admitted into evidence. It treats the unamortized items in the same manner as do the balance sheets. Instruction 181 of that document lists "Unamortized Debt Discount and Expense" under "DEFERRED DEBITS," together with other debit accounts which cannot be deducted directly from any account on the liabilities and capital side of the ledger. Neither that instruction nor instructions 221 through 224, dealing with "LONG-TERM DEBTS," make reference to the unamortized expense or discount balances being deducted from the face amount of debt instruments to obtain a true "Total Long-Term Debt" balance. Neither does instruction 251, "Unamortized Premium on Debts," make any reference to use of its balance in obtaining such a balance.

The balance sheets make reference to the accounts for the various items discussed and those accounts are filed as supplements to the balance sheets. One account covers "Unamortized Debt Discount and Expense and Unamortized Premium on Debt." That account lists the face amount of each bond issue and the "Total Discount and Expense or Net Premium on each." It then lists the balance in the amortization account at the beginning of the year, the adjustment made during the year to the amortization account, and the balance in that account at the end of the year. Totals are given for the discount accounts, the balances at the beginning of the year, the adjustments made, and the ending balance. No totals are given for the face amount of indebtedness, nor are any adjustments made to the face amount of the debt instruments. The "Long-Term Debt Account" makes no reference to expenses of issuance, discount, or premium.

The plain language of a statute is controlling unless a different legislative intent is apparent from the purpose and history of the Act. (*Bodine Electric Co. v. Allphin* (1980), 81 Ill. 2d 502, 410 N.E.2d 828.) "The legislative intent should be sought primarily from the language used in the statute, and if such intent can be ascertained therefrom, it should prevail without resorting to other aids for construction." *Louis A. Weiss Memorial Hospital v. Kroncke* (1957), 12 Ill. 2d 98, 105, 145 N.E.2d 71, 74.

Defendants maintain that the legislature must be presumed to have known the makeup of the Commission's balance sheet forms.

(See *Krebs v. Board of Trustees* (1951), 410 Ill. 435, 102 N.E.2d 321.) They thus conclude that there is no ambiguity in how "total long-term debt" is to be determined and maintain that further judicial inquiry is unwarranted. The record does not support such a conclusion.

The balance sheet forms provided by the Commission have no exact category titled either "total stockholder's equity" or "investments and advances to all corporations," the other two elements of "invested capital" under the Act. The parties have agreed that "total stockholder's equity" corresponds to the line item on the Commission form labelled "Total Proprietary Capital." (Since under section 2a.2 of the Act utilities are required to report "total proprietary capital" to the Department of Revenue, this is a logical construction.) Plaintiff's expert testimony indicated that "investments in and advances to all corporations" can only be determined by first looking to *two* different line items on the debit side of the balance sheet, "Investments in Associated Companies" and "Other Investments," *and then* examining supplemental schedules to determine the nature of the individual entries. Defendants have not argued that this is incorrect.

Two of the three components of "invested capital" cannot be determined by mechanically matching a single line item from the Commission's balance sheet to the wording of the statute. Consequently, we cannot conclude from the face of the statute that by saying "as set forth on the balance sheet," the legislature meant a particular line item, and it only, should be used to determine the third component, merely because the language in the statute and on the form is the same. Whether the coincidence is a fortuity, as plaintiff suggests, can only be determined by delving beyond the plain words of the statute.

Relying on *Illinois Power Co. v. Mahin* (1977), 49 Ill. App. 3d 713, 364 N.E.2d 597, defendant argues that we should not look beyond the plain words of the statute to plaintiff's accounting methods established by the Commission. We find *Illinois Power Co.* inapposite because the statute there contained a complete and specific definition of the term in question. Furthermore, the question here is not one of accounting methods, but rather what significance the legislature meant to give to a particular way of presenting financial information and the terminology used on an informational form.

■ "The cardinal rule of statutory construction, to which all other canons and rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature." (*People ex rel. Hanrahan v. White* (1972), 52 Ill. 2d 70, 73, 285 N.E.2d 129, 130, *cert. denied* (1972), 409 U.S. 1059, 34 L. Ed. 2d 511, 93 S. Ct. 562, citing *People v. Hudson* (1970), 46 Ill. 2d 177, 263 N.E.2d 473.) Inter-

pretation of a statute must be grounded on the nature and the object of the statute as well as the consequences which would result from construing it one way or another. *Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 373 N.E.2d 1332.

The tax in question purports to be imposed on "invested capital." The language used to describe the components of invested capital, "total stockholder's equity and total long-term debt, less investments in and advances to all corporations," even in a nontechnical sense, gives the general impression of a tax on the amount of money at least semi-permanently committed to the utility's operation. Indeed, in *Continental Illinois National Bank & Trust Co. v. Zagel* (1979), 78 Ill. 2d 387, 401 N.E.2d 491, the Illinois Supreme Court sustained the constitutionality of the tax on the basis that it was an excise tax levied on the privilege of engaging in a particular business.

If a utility were to raise $500 by selling a debt instrument, denominated on its face at $1,000, it could in no sense be thought to have $1,000 to use for engaging in business. It is true that when the time comes to redeem the debt the utility must have $1,000. However, by that time the amount of the original discount, whether by amortization or some other charge against income, will have in some manner reduced stockholder's equity.

That the Commission recognizes the need for adjustments for premiums, discounts and expenses incurred when raising any form of capital is abundantly clear. The line on the form labelled "total proprietary capital," which is assumed to be "total stockholder's equity" under the Act, is determined by adjusting the capital stock account for premiums, discounts and expenses on the sale of stock. The expert testimony established that when the Commission makes substantive decisions which require knowledge of a utility's invested capital and long-term debt, it makes the very deductions and additions for which plaintiff argues. In making these deductions and additions, the Commission uses the figures "as set forth on the balance sheet."

It is significant that the Commission, although it has prepared the balance sheet format solely for its own purposes, does not view the format controlling in matters of substance, but only as a way for a utility to report information. Why the Commission has chosen this particular format to set forth long-term debt and its premiums and discounts, may be rooted in old accounting practices or other irrelevant considerations. However, the record is clear as to how the Commission uses the balance sheet figures to determine long-term debt.

"Commercial, trade, or professional terms used in a statute which has reference to, or deals with, the trade, business, or

profession are construed in the sense in which such terms are generally used or understood in the trade, business, or profession, even though such meaning may differ from their common or ordinary meaning." (82 C.J.S. *Statutes* sec. 330 (1953); see, *e.g., Donham v. Joyce* (1912), 257 Ill. 112, 122, 100 N.E. 4; *Herring v. Poritz* (1880), 6 Ill. App. 208, 210-11.)

Here, as discussed earlier, the meaning given by the administrative agency with expertise even coincides with common sense notions regarding the meaning of "invested capital."

■ Furthermore, to mechanically adhere to a reporting format leaves the amount of the tax dependent on how the Commission deems it convenient to have the information displayed. Since it has been shown that at least some of that display has no substantive meaning to the Commission, it is unreasonable to conclude that changes in the forms which may be cosmetic should be able to change the substance of the tax on invested capital. A change in the Commission's method of determining total long-term debt or invested capital for substantive purposes would of course be a different matter.

Similarly, the situation here is not analogous to the use of adjusted gross income from Federal tax returns to establish a taxpayer's base income for the purpose of the Illinois Income Tax Act. (Ill. Rev. Stat. 1981, ch. 120, par. 1—101 *et seq.*) In that case, the extrinsic term which is being relied on is strictly defined by the Internal Revenue Code, not merely picked up as a nonsubstantive line item from an informational form.

Allowing a nonsubstantive format to control a tax is not the only unreasonable result to which defendants' position would lead. Consider the example of three utilities which each raise $2,000 in cash to invest in equipment. One sells bonds with a very low interest rate (on its face), and because market rates are high it takes the sale of four $1,000 bonds to raise $2,000. Another utility sells its bonds with a face interest rate above the market and receives $2,000 upon the sale of one $1,000 bond. The third utility sells stock having a par value of $100, netting $2,000, after expenses. By defendants' interpretation of the law, the first utility will pay a tax on $4,000, the second on $1,000, and the third on $2,000. This is so, even though they all raised the same amount of money and employed the same amount of money in their utility business.

■ While the legislature could impose such a tax, there is no evidence that that was the purpose of the present tax. Such a perverse division of the tax burden would not be a tax on "invested capital" nor would it be an excise tax on the privilege of doing business as a

utility. It would be a graduated tax on the issuance of bonds at an interest rate lower than the market rate. Such a result is both unreasonable and clearly not within the intent of the legislature. Taxing statutes should be construed so that they are given a reasonable and common sense meaning. (*Department of Revenue v. Joseph Bublick & Sons, Inc.* (1977), 68 Ill. 2d 568, 369 N.E.2d 1279.

Finally, plaintiff calls to our attention *Moline National Bank v. Department of Revenue* (1983), 111 Ill. App. 3d 1086, 444 N.E.2d 1164. The question there concerned section 203(b)(2)(A) of the Illinois Income Tax Act (Ill. Rev. Stat. 1981, ch. 120, par. 2—203(b)(2)(A)), which requires corporate payers to modify their taxable income based upon the Internal Revenue Code by the amount of interest accrued or received which was exempt under the Internal Revenue Code. In this case it was exempt municipal bond interest. Section 203(b)(2)(A) made no provision for the corporate taxpayer to deduct from the amount of that interest the yearly amortization of any premium paid in purchase of the bonds. The Third District, in a split decision, held that the right to do so was implied. It noted: (1) The tax was stated to be a tax on "net income" (Ill. Rev. Stat. 1981, ch. 120, par. 2—201); (2) the Internal Revenue Code permitted the deduction for nonexempt interest; (3) reasonable accounting would require the deduction.

The First District has recently come to the opposite conclusion. (*Continental Illinois National Bank & Trust Co. v. Lanckos* (1983), 115 Ill. App. 3d 538.) The court in *Continental Illinois Bank*, as well as the dissent in *Moline*, maintained that because the statute made no provision for deductions from interest, none could be implied. It also noted that in other parts of the Illinois Income Tax Act the term "interest" had not been construed in the manner that the taxpayer was advocating.

While there is some analogy between the issue in *Moline* and *Continental Illinois Bank* and the situation found here, the peculiar nature of the Illinois Income Tax Act and its relation to the Internal Revenue Code precludes any direct comparison. Our holding is based on the circumstances of the statute in question only.

We conclude from both the unreasonableness of the results of defendants' construction and the general purpose of the statute that the legislature intended that long-term debt for purposes of this tax on invested capital be determined with the adjustments plaintiff has made on its return. Our responsibility "is to ascertain and give effect to the true intent and meaning of the legislature." *People ex rel. Hanrahan v. White* (1972), 52 Ill. 2d 70, 73, 285 N.E.2d 129, 130.

The judgment of the trial court is reversed and remanded.

Reversed and remanded.

TRAPP, J., concurs.

JUSTICE GREEN, dissenting:

Section 1 of the Gas Revenue Tax Act defines "invested capital" as an amount computed from the average balances at the beginning and end of each for three categories of items "*as set forth on the balance sheets*" (emphasis added) (Ill. Rev. Stat. 1981, ch. 120, par. 467.16) included in certain reports which were required to be submitted to the Illinois Commerce Commission. One of those categories is "total long-term debt."

The form for those reports contains an item for "Total Long-Term Debt" and lists it on the "Liabilities and Other Credits" side of the balance sheet. Neither the form prescribed, by the Commission nor the Uniform System of Accounts for Gas Utilities prescribed by the Commission for keeping the accounts, provides for making a deduction for unamortized discount or expense in computing the total amount of long-term debt. Rather those items of discount and expense are placed on the "Assets and Other Debits" side of the balance sheet. The majority would, nevertheless, make a deduction for those items in determining "total long-term debt" within the meaning of section 1 of the Act because they believe the legislature intended the use of certain accounting principles which would treat these items in that way.

My disagreement with the majority stems from my interpretation of the portion of section 1 which states "*as set forth on the balance sheets*" (emphasis added). The phrase "set forth" is defined as: "to give an account or statement of" or "present fully and clearly: EXPLAIN, DESCRIBE." (Webster's Third New International Dictionary 2077 (1971).) The use by the legislature of the phrase indicates an intention that the balance sheet format was intended to have a significance beyond the amount of the figures contained on the sheet. The method of accounting for, stating, describing, and explaining the figures was also to be of significance. As the determination for the amount of total long-term debt was presented and explained on the balance sheets, no deduction was made for unamortized discount or expenses. As the amount of total long-term debt was "set forth" in that manner on the balance sheets, it should have been "set forth" in that manner in determining "invested capital."

My position is not premised principally on the coincidence in wording between section 1 and the balance sheet forms with refer-

ence to total long-term debt. Rather it is based on the format by which the item is calculated for balance sheet purposes. If it were necessary to add two or more items on the same side of the balance sheet to obtain "total long-term debt" my position would be the same. Thus, the theory of this dissent is not negated because some interpretation of the balance sheet was necessary to determine the balances for the other two categories of "invested capital." In calculating these two categories, items on one side of the balance sheet were not added to or subtracted from those on the other side to obtain the required balances. In each case the interpretations made were consistent with the format of the balance sheets and the prescribed Uniform System of Accounting for Gas Utilities.

The recognition by the Commission that discount and expenses in issuance of stock was a direct deduction to be made in determining "total proprietary capital" does not indicate an intention that the unamortized portions of those items arising from issuance of instruments of debt should be treated in the same way. Discount and expense in issuance of stock are not amortized. It is consistent with conservative accounting principles to show capital items in a way that minimizes the amount, while showing items of debt in the full amount that will eventually have to be paid.

I agree with the majority that the position of the dissent would discourage issuance of discount bonds, but I do not suppose that, in any event, bonds would be issued at discounts as large as set forth in the hypothetical used by the majority. I also agree with the majority that allowing adjustments for the two unamortized items in determining "total long-term debt" would be in accordance with general accounting principles and would aid in making a more realistic determination of "invested capital." However, the phrase "invested capital" is, at best an uncertain phrase. Here, it was obviously not limited to the amount furnished by the investors. Nor is long-term debt and proprietary capital accurate criteria for determining the expenditures for assets having long-term value. Some long-term debt is created to supply working capital and some short-term debt is used to purchase assets to be used over a period of years.

The majority correctly states that the instant tax was enacted as a partial replacement for the corporate personal property tax. Article IX, section 5(c) of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, sec. 5(c)) mandated this replacement and required it to be done by means other than the imposition of *ad valorem* taxes on real estate. In *Continental Illinois National Bank & Trust Co. v. Zagel* (1979), 78 Ill. 2d 387, 401 N.E.2d 491, the supreme court upheld the

"invested capital tax" as being an excise tax on the privilege of operating as a utility and not an *ad valorem* tax on property. The opinion indicated that a major purpose of the legislation was to impose on utilities a tax burden similar to that it had under the personal property tax. The focus of the legislative intent was to produce a viable excise tax. The court held that the lack of relationship between the book value of the "total long-term debt" and "total stockholders equity" balances and the actual value of the assets of the utility supported the theory that the measure was an excise tax.

In the context of the foregoing legislative history, it is not appropriate to assume the legislature intended to use the accounting principles advanced by the majority when the express language indicates otherwise. The figure shown on the balance sheet for total long-term debt is the amount that (1) the utility will eventually have to pay as principal on that debt, and (2) would be due at present if the debts were all accelerated and made payable presently. There is a rational basis for using the balance of the "Long-Term Debt" account in determining the basis for an excise tax on the privilege of operating as a utility.

Accordingly, I would affirm.